Opinion
MORENO, J.
The superior court granted extensive visitation rights to the paternal grandparents of a five-year-old girl with the approval of the father but over the objection of the mother, who has sole custody of the child. Applying the United States Supreme Court’s decision in Troxel v. Granville (2000) 530 U.S. 57 [147 L.Ed.2d 49, 120 S.Ct. 2054], the Court of Appeal reversed, holding that the visitation order violated the mother’s constitutional liberty interest in the custody, care, and control of her child.
For the reasons that follow, we conclude that Family Code section 3104 controls in this case and that the statute is constitutional, both on its face and as applied. Because the mother had sole custody of the child and objected to grandparent visitation, Family Code section 3104, subdivision (f), imposed a rebuttable presumption affecting the burden of proof that grandparent visitation was not in the child’s best interest. The superior court did not utilize this presumption. Accordingly, we remand the case to permit the superior court to reconsider its order permitting grandparent visitation in light of the statutory presumption that grandparent visitation is not in the best interest of the child.
I. Facts
Appellant Karen Butler (the mother) married respondent Charles Erik Harris (the father) on January 12, 1994. They separated on October 16, 1994, 10 days before the birth of their daughter, Emily. The mother filed for dissolution of marriage three months later, on January 18, 1995.
Clinical Psychologist Daniel O’Roarty, Ph.D., was appointed by the superior court to conduct a psychological assessment of the parties and reported that the mother and father met in San Diego in October 1993, when the mother was a helicopter pilot in the Navy. They began living together two weeks after they met, later moving to a boat in the Chula Vista Marina. As noted above, they married in January 1994, three months after they met.
*215 The mother claimed that during the marriage the father was psychologically and physically abusive to her. He hit her and called her names. On one occasion, he pushed her overboard and then tried to run her over with their dinghy as she swam to shore. During an altercation when she was six months pregnant, he kicked her in the stomach.
The father denied these accusations, but admitted using and selling marijuana and, on one occasion, using crystal methamphetamine, and admitted striking and biting the mother on several occasions that he described as mutually combative.
As noted above, the mother left the father shortly before Emily was bom and stayed in hotels and with a friend. She lived with the paternal grandparents, respondents Leanne and Charles Harris, for more than a week after Emily was bom and then moved into a shelter for battered women. She took Emily to visit the father regularly.
On July 21, 1995, the superior court, pursuant to stipulation of the parties, bifurcated the issues of child custody and visitation and entered judgment dissolving the marriage and granting the mother sole legal and physical custody of Emily, following the recommendation of Dr. O’Roarty. The judgment also provided that the mother could move to Maryland with Emily on or after August 5, 1995. The father was granted supervised visitation contingent on his undergoing psychotherapy, drag testing and attending Narcotics Anonymous meetings. A schedule was established for visitation pending the mother’s move to Maryland, which permitted the paternal grandparents to be present. Also by stipulation, the paternal grandparents were joined as parties to the action. They agreed not to interfere with the mother’s scheduled move to Maryland.
On August 2, 1995, the paternal grandparents filed a motion for visitation, alleging that the mother would not permit visitation absent a court order. The paternal grandparents asked that Emily spend 10 days at their home every other month. The mother’s response noted that Emily was 11 months old and was still nursing. She asked that all visitations take place in Maryland where she was living with her parents and be supervised until the paternal grandparents “get therapy on the issue of abuse.” The mother related that the father had been abused by the paternal grandfather, but the paternal grandparents denied this accusation. Family court services counselor Sandra Boyles conducted a mediation session in which the mother participated by telephone and the parties agreed that the paternal grandparents would visit Emily in Maryland for approximately 10 days, six times a year, with no overnight visits. Following a hearing, the court granted the paternal grandparents visitation with Emily in Maryland with no overnight visits and without the *216 father being present as follows: four visits per year for up to seven days each in 1996, six visits per year for up to seven days each in 1997, and six visits per year for up to 10 days each in 1998. The court ordered the grandparents to attend four counseling sessions to address the issue of abuse.
On April 29, 1996, the mother filed a motion to terminate the paternal grandparents’ visitation rights, alleging that their visits in January and April of 1996 “were extremely hostile and filled with conflict” and thus had been detrimental to Emily. The mother declared that Emily had nightmares after the paternal grandparents’ last visit, cried during her nap times, and clung to the mother “for days after the visits,” all of which behavior was unusual for her. The paternal grandparents filed a responsive declaration in which they agreed that the visits had been hostile, but placed the blame on the mother. Following a hearing, the court on October 30, 1996, denied the mother’s motion to terminate the paternal grandparents’ visitation rights and modified visitation to a maximum of four visits per year for a maximum of seven days each time, to continue until further order of the court.
On November 1, 1996, the paternal grandparents provided the mother with 30 days’ notice of their intention to visit Emily on December 1, 1996, but received no response. They traveled to the mother’s residence in Maryland and discovered that the mother and Emily had moved. The paternal grandparents hired several private investigators who, many months later, located the mother and the maternal grandparents in Utah. The mother had married Mark Butler, who had six children. The paternal grandparents contacted the mother and she agreed to visitation, which took place in mid-January 1998.
On January 20, 1998, the court found the mother in contempt for failing to comply with the court’s orders that she keep the paternal grandparents informed of her current address and permit the scheduled visitation. The court placed the mother on probation for two years. On July 21, 1998, the mother was ordered to pay $7,555 in attorney fees and expenses to the paternal grandparents, and the visitation order was modified to permit visitation within a 50-mile radius of the mother’s home in Utah.
The paternal grandparents had weeklong visits with Emily in Utah in April, July, and October of 1998. The paternal grandparents asked the mother if they could bring Emily, then four years old, to California on their next visit, but the mother declined, saying she was “not comfortable sending Emily to California.” In January of 1999, the paternal grandparents again visited Emily in Utah for seven days. The mother did not permit overnight visits.
On February 9, 1999, the paternal grandparents filed a motion to modify the visitation order to permit them to bring Emily to California for visitation *217 and to permit overnight visits in Utah. On February 24, 1999, the father joined the paternal grandparents’ request for visitation in California so that the father could visit Emily while she was in the care of his parents.
On March 17, 1999, pursuant to court order, the mother, the father, and the paternal grandparents met with family court services counselor Sandra Boyles. The father requested unsupervised visits with Emily or, at least, visits at his parents’ home. The father became so agitated and hostile during the conference that Boyles asked him to leave. Boyles recommended that the father be permitted visitation only in the presence of a trained supervisor and that Emily not have contact with her father while in the care of her paternal grandparents. Boyles recommended that the paternal grandparents continue to have weeklong visits with Emily four times per year until she started school. The next visit was to be in Utah, and Emily was to spend the week with the grandparents at a hotel. Subsequent visits were to be at the grandparents’ home in California.
On March 31, 1999, the mother filed a declaration objecting to the recommendation that Emily visit the paternal grandparents in California on the ground that the grandparents would not be able to protect Emily from her father, who was violent, had abused the mother, and had threatened to take Emily.
At a hearing on May 5, 1999, the court observed that it understood why the mother was apprehensive about permitting Emily to visit the paternal grandparents in California, but added: “I don’t share that apprehension at all.” The court adopted Boyles’s recommendations permitting the paternal grandparents to have weeklong visits with Emily four times per year until she started school, with the next visit to take place in Utah and subsequent visits to take place in California. The court ordered the grandparents to permit no contact between Emily and her father during these visits. The grandparents visited Emily in Utah for a week in April 1999 and Emily visited the grandparents’ home in California in October 1999 and January 2000.
By letter dated February 5, 2000, the father informed the mother that he had moved into his parents’ home. The paternal grandparents indicated that, nevertheless, the father would have no contact with Emily during her next visit.
On May 26, 2000, the paternal grandparents filed an order to show cause for visitation beginning when Emily started kindergarten in August 2000. The grandparents alleged they had had their fourth weeklong visit with Emily in California in April and were planning another before Emily started school. *218 The grandparents requested the following visitation: two weeks in August, one week during Christmas/New Year, one week during Easter, and one week during June.
In a responsive declaration filed on June 12, 2000, the mother objected to court-ordered visitation, noting that she never would prevent Emily from being with her paternal grandparents, but believed it was wrong to force Emily to leave her family against her will. In her supporting points and authorities, the mother asked that the paternal grandparents’ request for visitation be denied.
On June 19, 2000, the mother, the father, and the paternal grandparents participated in a mediation session with family court services counselor James Bruce. The mother wanted to limit the length of Emily’s visits to one week. She reluctantly agreed to a two-week visit in June, but wanted one week in August and no visit during the Christmas holiday. Bruce opined that “the minor benefits from contact with the paternal grandparents and that it is in her best interest to continue to have contact with them.” He noted that the mother did not dispute that Emily’s contact with her paternal grandparents was beneficial, but believed such contact should not be court ordered. Bruce made the following recommendations, noting they were “admittedly arbitrary because the undersigned has not met Emily and does not know her temperament”: visitation for 10 to 11 days twice during the summer. He deferred “to the wisdom of the court” regarding visitation during the Christmas holiday.
At a hearing on July 10, 2000, the court stated that it would apply “a best interest standard” that focused on the “health, safety and welfare” of the child. The court remarked that it did not question the mother’s motivation to end court-ordered visitation by the paternal grandparents: “I do think she believes that it is best for this child if she provides the family unit and she makes the decisions as to what contact, if any, would exist between other people and this child.” Regarding the paternal grandparents, the court stated its belief that “they truly love this child and they care about the child and that they want to continue to have that relationship and that it is very important to them.” The court concluded: “I think presently, at least, that it is in the best interest of this child to continue to have a significant relationship with the grandparents,” adding that the court did not believe “there is any realistic possibility that if I leave this to the mother’s good graces, essentially as the parent, that she would do anything to encourage the relationship in spite of what she says. Her actions are absolutely contrary to that . . . .” The court acknowledged that visitation created practical problems for the Butler family, but concluded the difficulties did not justify cutting off the grandparents’ visitation, concluding “that the rewards for the child are greater than any deficits that we have.” The court noted that its conclusions were “tough calls *219 because I do have to acknowledge that the grandparents are interfering to some degree with the mother’s rights as a parent to the extent they exist to raise children . . . .”
The court awarded the paternal grandparents visitation for 12 days in August, 12 days in June, and from December 26 to 31. The court ordered that Emily fly unaccompanied to California on a nonstop flight beginning with the December visit if permitted by the airlines to do so, and required the mother to take Emily to the airport in Utah and pick her up.[1] The paternal grandparents Anther were permitted to take Emily to visit other relatives in or out of California.
The mother appealed and the Court of Appeal reversed, holding that the visitation order denied the mother due process of law under both the federal and California Constitutions, explaining that the paternal grandparents should have been required “to show by clear and convincing evidence that the parents’ decision [to deny or limit visitation] would be detrimental to the child.”
At the request of the mother, and without objection by the paternal grandparents, we have taken judicial notice of the fact that after this court granted review, the superior court, on October 28, 2002, terminated the father’s parental rights.
II. Discussion
Grandparents’ rights to court-ordered visitation with their grandchildren are purely statutory. (White v. Jacobs (1988) 198 Cal.App.3d 122, 124-125 [243 Cal.Rptr. 597].) Three California statutes expressly address grandparent visitation: Family Code section 3102,[2] which permits visitation by a deceased parent’s children, siblings, parents, and grandparents if such visitation would be in the best interests of the child; section 3103,[3] which *220 permits a court in specified proceedings involving the custody of a child to grant grandparent visitation; and section 3104,[4] which permits grandparents to petition for visitation if the grandchild’s parents are not married or if certain other conditions are met.[5]
We first must determine which statute controls in this case. Section 3102 does not apply because neither parent is deceased.
Section 3103 provides that in specified proceedings involving the custody of a child, including proceedings for dissolution of marriage, “the court may grant reasonable visitation to a grandparent of a minor child of a party to the proceeding if the court determines that visitation by the grandparent is in the best interest of the child.” (§ 3103, subd. (a).) The visitation order in the present case was issued in a proceeding for dissolution of marriage, but it was issued years after a judgment had been entered dissolving the marriage and awarding sole custody of the child to the mother.
Section 3104 permits a grandparent to petition a court for visitation if the child’s parents are not married or are living separately or if certain other conditions apply. (§ 3104, subd. (b).) The court may grant reasonable visitation if the court “[fjinds that there is a preexisting relationship between the *221 grandparent and the grandchild that has engendered a bond such that visitation is in the best interest of the child” and “[b]alances the interest of the child in having visitation with the grandparent against the right of the parents to exercise their parental authority.” (§ 3104, subd. (a).)
Both section 3103 and section 3104 provide a rebuttable presumption that grandparent visitation is not in the child’s best interest, if the parents agree that the grandparents should not be granted visitation. (§§ 3103, subd. (d), 3104, subd. (e).) Neither of these provisions applies in this case, however, because Emily’s father supports the paternal grandparents’ request for visitation rights.[6]
Section 3104 further applies the same rebuttable presumption against visitation “if the parent who has been awarded sole legal and physical custody of the child in another proceeding . . . objects to visitation by the grandparent.” (§ 3104, subd. (f).) Section 3103 contains no similar provision addressing the situation in which a parent has been awarded sole custody of the child.
The grandparents argue that section 3103 is the controlling statute. Section 3103 applies “[Notwithstanding any other provision of law, in a proceeding described in Section 3021,” which includes “[a] proceeding for dissolution of marriage.”[7] As noted above, the present action is a proceeding for dissolution of marriage, but the order for grandparent visitation was made several years after judgment had been entered dissolving the marriage and granting sole custody of Emily to the mother. We must determine, therefore, whether the Legislature intended section 3103 to apply in marriage dissolution proceedings after entry of judgment dissolving the marriage and awarding custody of the child.
“The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute. [Citations.]” (People v. Pieters (1991) 52 Cal.3d 894, 898 [276 *222 Cal.Rptr. 918, 802 P.2d 420].) But we also have held that “ ‘[i]t is a fundamental rule of statutory construction that statutes should be construed to avoid anomalies.’ ” (Equilon Enterprises v. Common Cause, Inc. (2002) 29 Cal.4th 53, 64 [124 Cal.Rptr.2d 507, 52 P.3d 685].) “ ‘Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]’ ” (Palos Verdes Faculty Assn. v. Palos Verdes Peninsula Unified Sch. Dist. (1978) 21 Cal.3d 650, 659 [147 Cal.Rptr. 359, 580 P.2d 1155].) “Thus, ‘[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.’ [Citation.] Finally, we do not construe statutes in isolation, but rather read every statute ‘with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.’ [Citation.]” (People v. Pieters, supra, 52 Cal.3d at p. 899; see Brown v. Superior Court (1984) 37 Cal.3d 477, 485 [208 Cal.Rptr. 724, 691 P.2d 272].)
Considering section 3103 in light of section 3104, it appears that in marriage dissolution proceedings, the Legislature intended section 3103 to govern grandparent visitation only until entry of a judgment dissolving the marriage and awarding custody of the child. This construction of section 3103 furthers the Legislature’s intent for the following reasons.
The apparent purpose of section 3103 is to permit a court to grant grandparent visitation during the pendency of certain judicial proceedings involving custody of the child. This permits the court in a marriage dissolution action, for example, to consider grandparent visitation when fashioning its custody and visitation orders. But the situation changes once the marriage has been dissolved and custody of the child and any visitation orders have been determined by entry of judgment. Although the court retains jurisdiction to modify its custody and visitation orders upon a showing of changed circumstances at any time while the child remains a minor (Burchard v. Garay (1986) 42 Cal.3d 531, 535 [229 Cal.Rptr. 800, 724 P.2d 486]), it would make little sense to permit grandparents to seek a visitation order in a marriage dissolution proceeding after a judgment dissolving the marriage and awarding custody of the child has been entered. If we so construed section 3103, it would permit a grandparent to seek visitation in a marriage dissolution proceeding at any time until the child becomes an adult. It appears, instead, that the Legislature intended that once a judgment dissolving the marriage and awarding custody of the child has been entered, the provisions of section 3104 would govern whether the grandparents should be granted visitation. This conclusion is supported by the circumstance that section 3104 permits a grandparent to petition for visitation if the parents are not married. The provisions of section 3104 thus come into play once a judgment dissolving the marriage and determining custody of the child has been entered.
*223 Our conclusion also is supported by the circumstance that section 3104, and not section 3103, contains a provision addressing the situation in which a parent has been granted sole custody of the child. As noted above, both statutes contain a rebuttable presumption against grandparent visitation if the parents agree that such visitation should be denied. But only section 3104 also applies a rebuttable presumption against grandparent visitation if the parent granted sole custody of the child objects. We conclude that the Legislature did not include a similar provision in section 3103 because it would not be needed during marriage dissolution proceedings before a judgment awarding custody had been entered. There would be no need to include such a provision in section 3103 if, as we conclude, a request for grandparent visitation is governed by section 3104 once a judgment has been entered dissolving the marriage and awarding sole custody of the child to one parent.
Our construction prevents the anomalous result of applying a rebuttable presumption against grandparent visitation if a parent granted sole custody objects to a petition filed under section 3104, but not if the court grants such visitation in a marriage dissolution proceeding under section 3103. It is difficult to imagine why the Legislature would intend the presumption to apply in one circumstance but not the other.
We conclude, therefore, that the present case is governed by section 3104.
The mother contends that section 3104 is unconstitutional both on its face and as applied in this case, because it unduly burdens her parental liberty interest in the custody, care, and control of her child. We first address the mother’s claim under the federal Constitution.
A sharply divided United States Supreme Court addressed the thorny issue of grandparent visitation in Troxel v. Granville, supra, 530 U.S. 57, 60, considering a Washington statute that permitted “ ‘[a]ny person’ ” to petition the superior court for visitation rights “ ‘at any time’ ” and authorized the court to grant such visitation if it would “ ‘serve the best interest of the child.’ ” The paternal grandparents petitioned for visitation with their two granddaughters after their son committed suicide and the children’s mother notified them she wished to limit their visitation with her daughters to one short visit a month. The parents had never married and had separated two years before the father died. Before his death, the father had lived with the paternal grandparents and had regularly brought his daughters to his parents’ home for weekend visits.
Justice O’Connor’s plurality opinion in Troxel, in which Chief Justice Rehnquist, and Justices Ginsburg and Breyer joined, observed that “the Due Process Clause of the Fourteenth Amendment protects the fundamental right *224 of parents to make decisions concerning the care, custody, and control of their children.” (Troxel v. Granville, supra, 530 U.S. 57, 66.) The plurality opinion concluded that the Washington statute, as applied in that case, violated that fundamental liberty interest. (Id. at p. 67.) The plurality stated: “[T]here is a presumption that fit parents act in the best interests of their children.” (Id. at p. 68.) “Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent’s children. [Citation.]” (Id. at pp. 68-69 (plur. opn. of O’Connor, J.).)
But the plurality did not prohibit the state from ordering grandparent visitation, stating instead: “The problem here is not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to Granville’s determination of her daughters’ best interests.” (Troxel v. Granville, supra, 530 U.S. 57, 69 (plur. opn. of O’Connor, J.).) To the contrary, “[t]he judge’s comments suggest that he presumed the grandparents’ request should be granted unless the children would be ‘impact[ed] adversely.’ In effect, the judge placed on [the mother], the fit custodial parent, the burden of disproving that visitation would be in the best interest of her daughters.” (Ibid.)
Noting that “the court’s presumption failed to provide any protection for [the mother’s] fundamental constitutional right to make decisions concerning the rearing of her own daughters,” the plurality included a “cf.” cite to section 3104, subdivision (e), which, as noted above, creates a “rebuttable presumption that grandparent visitation is not in [the] child’s best interest if [the] parents agree that visitation rights should not be granted,” (Troxel v. Granville, supra, 530 U.S. 57, 69-70 (plur. opn. of O’Connor, J.).)
The plurality in Troxel concluded that the Washington statute failed to give sufficient weight to the parent’s judgment concerning the wisdom of grandparent visitation: “[T]he decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent’s decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent’s own determination.” (Troxel v. Granville, supra, 530 U.S. 57, 70 (plur. opn. of O’Connor, J.).) The plurality was careful to note, moreover, “that there is no allegation that [the mother] ever sought to cut off visitation entirely.” (Id. at p. 71.) The plurality firmly stated that a court may not simply substitute for the parent’s judgment its own judgment of what is best for the child: “[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a ‘better’ decision could be made.” (Id. at pp. 72-73.)
*225 Although concluding that the Washington statute was unconstitutional, the plurality adopted a cautious approach in this sensitive area of law: “Because we rest our decision on the sweeping breadth of [the Washington statute] and the application of that broad, unlimited power in this case, we do not consider the primary constitutional question passed on by the Washington Supreme Court—whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context. . . . [T]he constitutional protections in this area are best ‘elaborated with care.’ ” (Troxel v. Granville, supra, 530 U.S. 57, 73 (plur. opn. of O’Connor, J.).)
Justice Souter concurred in the judgment, but would have affirmed the Washington Supreme Court’s ruling that the statute is unconstitutional on its face, saying the case does not “call for turning any fresh furrows in the ‘treacherous field’ of substantive due process. [Citation.]” (Troxel v. Granville, supra, 530 U.S. 57, 76 (conc. opn. of Souter, J.).) “We have long recognized that a parent’s interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment. [Citations.]” (Id. at p. 77.) A parent’s right includes “the right to be free of judicially compelled visitation by ‘any party’ at ‘any time’ a judge believed he ‘could make a “better” decision than the objecting parent had done.’ ” (Id. at p. 78, fn. omitted.)
Justice Thomas concurred that parents have a fundamental right “to direct the upbringing of their children.” (Troxel v. Granville, supra, 530 U.S. 57, 80 (conc. opn. of Thomas, J.).) He would have applied a strict scrutiny standard of review, concluding that the State of Washington “lacks even a legitimate governmental interest—to say nothing of a compelling one—in second-guessing a fit parent’s decision regarding visitation with third parties.” (Id. at p. 80.)
The decision in Troxel does not support the mother’s argument here that section 3104 is unconstitutional on its face. Section 3104 is significantly different from the Washington statute at issue in Troxel. The Washington statute was, in the words of the plurality in Troxel, “breathtakingly broad,” permitting “ ‘[a]ny person’ ” to petition the superior court for visitation rights “ ‘at any time.’ ” (Troxel v. Granville, supra, 530 U.S. 57, 67 (plur. opn. of O’Connor, J.), italics omitted.) Section 3104 is more narrow, permitting grandparents of a minor child to petition the court for visitation rights only if the child’s parents are not married or are separated or if other similar conditions apply. Section 3104 requires that there be “a preexisting relationship between the grandparent and the grandchild that has engendered a bond *226 such that visitation is in the best interest of the child” and directs the court to balance “the interest of the child in having visitation with the grandparent against the right of the parents to exercise their parental authority” before ordering grandparent visitation. (§ 3104, subd. (a)(1), (2).) As the Court of Appeal stated in Lopez v. Martinez (2000) 85 Cal.App.4th 279, 287-288 [102 Cal.Rptr.2d 71]: “It can hardly be said the California statute at issue in this case comes even close to being so ‘breathtakingly broad’ as to be unconstitutional. On the contrary, it explicitly limits the situations and circumstances in which grandparents can petition for visitation rights. Even when grandparents are statutorily given standing to petition for visitation rights, there is always a rebuttable presumption in favor of the parents when the parents conclude visitation is not in the best interests of the child. (§ 3104, subds. (e), (f).) The result is a balance between the child’s interest in the grandparental relationship and the right of the parents to rear their own child as they see fit.”
As the Court of Appeal recognized in Lopez v. Martinez, supra, 85 Cal.App.4th 279, 288, the Legislature limited section 3104 by creating rebuttable presumptions against grandparent visitation “if the [child’s] parents agree that the grandparent should not be granted visitation rights” (§ 3104, subd. (e)), or if the parent awarded sole custody objects to grandparent visitation (§ 3104, subd. (f)). These provisions prevent the situation that arose in Troxel in which the court ordered visitation over the objection of the child’s sole surviving fit parent based upon a finding that such visitation was in the child’s best interest. Unlike the Washington statute at issue in Troxel, section 3104 gives “special weight” to the parents’ decision, if the parents agree that visitation is not in their child’s best interest, or to the decision of a parent who has been awarded sole custody of the child. The high court recognized as much by citing with approval section 3104, subdivision (e). (Troxel v. Granville, supra, 530 U.S. 57, 70 (plur. opn. of O’Connor, J.).)
Accordingly, section 3104 does not suffer from the constitutional infirmities that plagued the Washington statute considered in Troxel. Section 3104 does not violate the federal Constitution on its face, as Justice Souter concluded the Washington statute did, because it does not permit “judicially compelled visitation by ‘any party’ at ‘any time’ a judge believed he ‘could make a “better” decision’ than the objecting parent had done.” (Troxel v. Granville, supra, 530 U.S. 57, 78 (conc. opn. of Souter, J.), fn. omitted.) Section 3104 permits only grandparents to seek visitation and only if the parents are not married or are separated or if other specified circumstances exist. It requires that there be “a preexisting relationship between the grandparent and the grandchild that has engendered a bond such that visitation is in the best interest of the child,” directs the court to balance “the interest of the child in having visitation with the grandparent against the right of the parents to exercise their parental authority” and creates rebuttable presumptions against visitation if the parents agree that grandparent visitation *227 is not in their child’s best interest or a parent with sole custody of the child objects to grandparent visitation. (§ 3104, subd. (a)(1), (2).)
Neither does the decision in Troxel support the mother’s argument here that section 3104 violates the federal Constitution as applied in this case. Troxel involved an order for grandparent visitation that was opposed by the child’s sole surviving fit parent. That was not the situation before the superior court in this case when it issued the visitation order under review. Rather, the parents of the child in the present case disagreed concerning grandparent visitation, and the father had not been declared unfit and his parental rights had not yet been terminated. Nothing in the decision in Troxel suggests that an order for grandparent visitation that is supported by one parent infringes upon the parental rights of the other parent.
The mother attempts to equate herself to a sole surviving parent by describing the father as “uninterested” and asserting, without explanation or citation of authority, that he is “akin” to a deceased parent. We disagree. The father in the present case is alive and, as noted above, at the time of the visitation order at issue here, his parental rights had not been terminated. The mother had been awarded sole legal and physical custody of Emily, but this did not terminate the father’s parental rights, nor did it terminate his due process interest in parenting. (See, e.g., Hoversten v. Superior Court (1999) 74 Cal.App.4th 636, 641 [88 Cal.Rptr.2d 197] [acknowledging the constitutional interest of an incarcerated parent in visitation with his child].) An order granting a parent sole legal custody “means that one parent shall have the right and the responsibility to make the decisions relating to the health, education, and welfare of a child.” (§ 3006.) This is different from, and far less drastic than, an order declaring a minor free from the control of a parent, which “terminates all parental rights and responsibilities with regard to the child” (§ 7803) and leaves the child eligible for adoption. (In re Marriage of O’Connell (1978) 80 Cal.App.3d 849, 854 [146 Cal.Rptr. 26]; see County of Ventura v. Gonzales (2001) 88 Cal.App.4th 1120, 1123-1124 [106 Cal.Rptr.2d 461] [dicta]; In re Marriage of Dunmore (2000) 83 Cal.App.4th 1, 5 [98 Cal.Rptr.2d 885] [a father’s obligation to support his child does not cease until his parental rights are terminated].)
Court-ordered grandparent visitation over the objection of a sole surviving parent implicates that parent’s right to the custody and control of his or her child. (Troxel v. Granville, supra, 530 U.S. 57, 66 (plur. opn. of O’Connor, J.); Punsly v. Ho (2001) 87 Cal.App.4th 1099 [105 Cal.Rptr.2d 139]; Kyle O. v. Donald R. (2000) 85 Cal.App.4th 848 [102 Cal.Rptr.2d 476].) But the mother in the present case has cited no authority that holds that an order for grandparent visitation that is supported by one of the parents infringes upon the parental rights of the other parent.
*228 In his concurring and dissenting opinion, Justice Chin concludes that the father’s support of the grandparents’ request for visitation “is legally irrelevant and does not affect the constitutional protection to which [the mother], as Emily’s sole legal custodian, is entitled against state interference with her parenting decisions.” (Conc, and dis. opn. of Chin, J., post, at p. 240.) But with the exception of two out-of-state cases (In re Marriage of Howard (Iowa 2003) 661 N.W.2d 183; Rust v. Rust (Tenn.Ct.App. 1993) 864 S.W.2d 52, 53), the decisions cited in support of this proposition discuss the rights of both parents to control the manner in which they should rear their child, or the rights of a sole surviving parent, and do not support the conclusion that one parent has a due process right that may be infringed if a third party is granted visitation with the child with the consent of the other parent. As the plurality opinion in Troxel cautioned, we should be very careful in identifying the scope of the due process interest in parenting. (Troxel v. Granville, supra, 530 U.S. 57, 72-73 (plur. opn. of O’Connor, J.) [“we agree with JUSTICE KENNEDY that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best ‘elaborated with care’ ”].)
In his concurring and dissenting opinion, Justice Baxter concludes that “[t]he majority errs in reaching out to consider and reject the mother’s as-applied constitutional challenge to section 3104(f).” (Conc, and dis. opn. of Baxter, J., post, at p. 231.) It can hardly be said that we are “reaching out” to decide this issue. The Court of Appeal held that section 3104 is unconstitutional as applied in this case. We granted review to resolve that issue, among others.
Justice Baxter’s concurring and dissenting opinion cites, in support of his assertion that it is improper for us to decide whether the statute is unconstitutional as applied, the observation in Bowen v. Kendrick (1989) 487 U.S. 589, 600 [101 L.Ed.2d 520, 108 S.Ct. 2562], that “only a facial challenge could have been considered, as the Act had not been implemented.” The high court was referring to its earlier decision in Edwards v. Aguillard (1987) 482 U.S. 578 [96 L.Ed.2d 510, 107 S.Ct. 2573], which involved a facial challenge to Louisiana’s “Creationism Act.” The opinion in Edwards notes that the state officials in that case “agreed not to implement the Creationism Act pending the final outcome of this litigation.” (Id. at p. 581, fn. 1.) The present case, unlike Edwards, involves a specific application of the challenged statute.
Justice Baxter’s concurring and dissenting opinion also cites our opinion in Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1085 [40 Cal.Rptr.2d 402, 892 P.2d 1145], for the proposition that an “as applied” challenge may be brought only if there is “ ‘a present impermissible application of the challenged statute or ordinance which the court can remedy.” ’ (Conc. and *229 dis. opn. of Baxter, L, post, at p. 231.) But Tobe involved an application for mandamus to bar enforcement of a local ordinance. (Tobe, at p. 1082, fn. 5.) We held that only a facial challenge to the ordinance had been perfected because the petitioners sought to bar any enforcement of the ordinance and had not successfully raised the issue that the ordinance had been enforced in an unconstitutional manner in a particular case. (Id. at pp. 1092-1093.) Similarly, Tunstall ex rel. Tunstall v. Bergeson (2000) 141 Wn.2d 201 [5 P.3d 691, 703], relied upon by the concurring and dissenting opinion, held that prison inmates failed to perfect an “as applied” challenge to a Washington statute because they “fail[ed] to provide any specific facts demonstrating that the State’s application of [the statute] has violated article IX [of the Washington Constitution]. Rather, the inmates merely speculate about constitutional problems that could result from [the statute]’s application.”
Although we conclude that the superior court erred in failing to utilize the rebuttable presumption in section 3104, subdivision (f), it remains the case that the superior court did apply the statute and, thus, it is proper for this court to determine whether section 3104 is constitutional as applied in this case.
In addition to her reliance upon the federal Constitution, the mother also bases her attack on section 3104 upon the California Constitution, citing our decisions in Conservatorship of Wendland (2001) 26 Cal.4th 519 [110 Cal.Rptr.2d 412, 28 P.3d 151], American Academy of Pediatrics v. Lungren (1997) 16 Cal.4th 307 [66 Cal.Rptr.2d 210, 940 P.2d 797], and Hill v. National Collegiate Athletic Assn. (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633]. Each of these cases applies the explicit guarantee of the right of privacy in the California Constitution (Cal. Const., art. I, § 1), but none does so in a context similar to the present case. Conservatorship of Wendland, supra, 26 Cal.4th 519, 531-532, involved the right to refuse medical treatment (“ ‘The constitutional right of privacy guarantees to the individual the freedom to choose to reject, or refuse to consent to, intrusions of his bodily integrity’ ”). American Academy of Pediatrics v. Lungren, supra, 16 Cal.4th 307, 332, involved the right of a pregnant minor to obtain an abortion without parental consent (“[T]he interest in autonomy privacy protected by the California constitutional privacy clause includes a pregnant woman’s right to choose whether or not to continue her pregnancy [citations]”). And Hill v. National Collegiate Athletic Assn., supra, 7 Cal.4th 1, 35, involved compulsory drug tests for college athletes (“Legally recognized privacy interests are generally of two classes: (1) interests in precluding the dissemination or misuse of sensitive and confidential information (‘informational privacy’); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intmsion, or interference (‘autonomy privacy’)”). None of these cases support the mother’s argument that an order *230 for grandparent visitation that is supported by one parent infringes upon the parental rights of the other parent.
We conclude, therefore, that section 3104 does not violate the federal or California Constitutions, either on its face or as applied.
As noted above, subdivision (f) of section 3104 creates “a rebuttable presumption affecting the burden of proof that the visitation of a grandparent is not in the best interest of a minor child if the parent who has been awarded sole legal and physical custody of the child . . . objects to visitation by the grandparent.” In the present case, the mother was awarded sole custody of Emily and objected to grandparent visitation. Accordingly, the grandparents were required to overcome a rebuttable presumption that visitation is not in Emily’s best interest. The record before us reflects that the superior court did not consider this presumption, but rather expressly utilized a “best interest of the child” standard. Accordingly, we will remand this case to the superior court to reconsider the visitation order in light of the presumption that grandparent visitation is not in Emily’s best interest.[8]
III. Disposition
We affirm the judgment of the Court of Appeal to the extent it reversed the order for grandparent visitation. The matter is remanded to the Court of Appeal with directions to remand the matter to the superior court for reconsideration of the order for grandparent visitation in light of the views expressed in this opinion and the superior court’s subsequent order terminating the father’s parental rights.
George, C. J., Kennard, J., and Werdegar, J., concurred.

 Pending these proceedings, the Court of Appeal ordered that Emily be accompanied by one of the paternal grandparents during any travel.

 All further statutory references are to the Family Code, unless otherwise noted.
Section 3102, subdivision (a), provides, in pertinent part: “If either parent of an unemancipated minor child is deceased, the children, siblings, parents, and grandparents of the deceased parent may be granted reasonable visitation with the child during the child’s minority upon a finding that the visitation would be in the best interest of the minor child.” Subdivision (c) states that the section “does not apply if the child has been adopted by a person other than a stepparent or grandparent of the child” and that “[a]ny visitation rights granted pursuant to this section . . . automatically terminate if the child is adopted” by such a person.

 Section 3103 provides, in pertinent part: “(a) Notwithstanding any other provision of law, in a proceeding described in Section 3021, the court may grant reasonable visitation to a grandparent of a minor child of a party to the proceeding if the court determines that visitation *220 by the grandparent is in the best interest of the child. [IQ ... HO (d) There is a rebuttable presumption affecting the burden of proof that the visitation of a grandparent is not in the best interest of a minor child if the child’s parents agree that the grandparent should not be granted visitation rights.”

 Section 3104 provides, in pertinent part: “(a) On petition to the court by a grandparent of a minor child, the court may grant reasonable visitation rights to the grandparent if the court does both of the following: [f¡ (1) Finds that there is a preexisting relationship between the grandparent and the grandchild that has engendered a bond such that visitation is in the best interest of the child. []Q (2) Balances the interest of the child in having visitation with the grandparent against the right of the parents to exercise their parental authority. [f] (b) A petition for visitation under this section may not be filed while the natural or adoptive parents are married, unless one or more of the following circumstances exist: [IQ (1) The parents are currently living separately and apart on a permanent or indefinite basis. [y (2) One of the parents has been absent for more than one month without the- other spouse knowing the whereabouts of the absent spouse, [y (3) One of the parents joins in the petition with the grandparents. [jQ (4) The child is not residing with either parent. Q] . . . fiQ (e) There is a rebuttable presumption that the visitation of a grandparent is not in the best interest of a minor child if the natural or adoptive parents agree that the grandparent should not be granted visitation rights. HQ (f) There is a rebuttable presumption affecting the burden of proof that the visitation of a grandparent is not in the best interest of a minor child if the parent who has been awarded sole legal and physical custody of the child in another proceeding or with whom the child resides if there is currently no operative custody order objects to visitation by the grandparent.”

 In addition, section 3100 provides that in making an order for joint custody of a minor child, “[i]n the discretion of the court, reasonable visitation rights may be granted to any other person having an interest in the welfare of the child.” (§ 3100, subd. (a).) As noted above, the present case does not involve an order for joint custody.

 As noted above, the superior court has since terminated the father’s parental rights, but this circumstance does not affect our analysis because it occurred after the superior court issued the order here at issue.

 Section 3021 provides: “This part applies in any of the following: HD (a) A proceeding for dissolution of marriage. HO (b) A proceeding for nullity of marriage, [f] (c) A proceeding for legal separation of the parties. [ID (d) An action for exclusive custody pursuant to Section 3120. []D (e) A proceeding to determine physical or legal custody or for visitation in a proceeding pursuant to the Domestic Violence Prevention Act. ... HD ... HD (f) A proceeding to determine physical or legal custody or visitation in an action pursuant to the Uniform Parentage Act. ... HD (g) A proceeding to determine physical or legal custody or visitation in an action brought by the district attorney pursuant to Section 17404.”

 Justice Baxter’s concurring and dissenting opinion asserts that although it is proper for us to decide that the statute is constitutional on its face, we can and should avoid deciding whether the statute is constitutional as applied because the matter must be remanded for the superior court to apply the rebuttal presumption in section 3104, subdivision (f). We do not agree that it is unnecessary to reach the constitutional issue. If we agreed with the mother that section 3104 is unconstitutional as applied to a parent such as herself who has been granted sole custody of the child, there would be no need to remand the matter.